## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Brandon Mancilla and )
Alexandra Vail Kohnert-Yount )
)
    Plaintiff, )
)     Case No. 2:22-cv-12443-VAR-DRG
        v. )
)
International Union, United Automobile, )
Aerospace, and Agricultural Implement )
Workers of America and Neil Barofsky )
)
    Defendant. )

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

### Introduction

Plaintiffs, through their attorneys, move for a preliminary injunction and temporary restraining order to enjoin Defendants from disallowing the majority of Local 2320's members from voting for the Regional Director of Region 9A, the Regional Director who oversees their local. Plaintiffs file this motion in light of the short time, only a few weeks, between this decision being made public and the distribution of ballots, which will begin on October 17.

### I.    Statement of Facts

#### a)    The Consent Decree, Referendum, and Direct Election of Union Officers

On January 21, 2021, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") entered into a consent decree with the Department of Justice. Dkt. 10, *United States v. UAW*, 2:20-cv-13293-DML-RSW (E.D. Mich. January 29, 2021). Agreed to amid a massive corruption scandal in which multiple top UAW officers went to prison for, among other things, colluding with the employers they negotiated with for personal gain, the deal mandated a referendum of the UAW membership on whether to switch

1

from a system of electing UAW leadership through a vote of delegates at convention to a one-member, one-vote system of direct elections. *Id.* As part of this mandate, UAW and the Department of Justice recognized that "honest and duly elected officials of the UAW are the best equipped to collectively bargain on behalf of its members and to enforce said agreements vigorously and aggressively." *Id.* The referendum was set for October to December of 2021. The consent decree also required the appointment of a Monitor to oversee the UAW and ensure that the requirements of the consent decree were carried out. *Id.* The Court appointed Neil Barofsky to serve as Monitor. Dkt. 53, *United States v. UAW* (E.D. Mich, January 31, 2022). In that referendum, the membership approved direct elections.

Following the results of the referendum, the Monitor began the process of setting up and running direct elections for all members of the UAW's International Executive Board. This included a President, a Secretary-Treasurer, three Vice Presidents, and a Regional Director for each of the nine regions that the UAW is broken up into for administrative purposes. Nominations for the five national International Executive Board ("IEB") members were made on the floor of the UAW Convention, held July 25-28, 2022. Nominations for Regional Director were made at the regional meetings conducted during the UAW Convention. All delegates from Local 2320 were instructed to attend the Region 9A regional meeting and were not invited to any other regional meeting. Local 2320 delegates could therefore only participate in the nomination process for candidates for Region 9A. Coming out of convention, five out of the nine regions did not have contested elections for Regional Director, with only a single candidate being nominated. Four regions had contested elections: Regions 1, 2B, 9, and 9A.

The election will be held by mail ballot. Ballots will start being sent out on October 17. UAW Election Rules, 7. The final date by which replacement ballots can be requested and sent out is November 11. *Id.* All ballots must be received by November 28. *Id.*

**b)** **Duties of a Regional Officer**

Regional Directors, officially styled as IEB Members in the UAW Constitution, have many executive functions in their regions, in addition to the legislative function they have as Board members. They "have direct supervision over all organizational activities within the region." UAW Constitution, Art 13, Sec. 23. They supervise all international staff assigned to their region, *id.*, Art. 14, Sec. 2, approve establishment and changes of local union dues, *id.*, Art. 47, Sec. 1, approve transfers of funds from local to local within their region, *id.*, Art. 26, Sec. 2, approve expenditures of local unions' new member orientation funds, *id.*, Art. 16, Sec. 1, and make recommendations to the IEB on whether to appropriate International Union funds to defray the expenses of a local union, *id.*, Art. 18, Sec. 2. They make recommendations to the IEB on whether to approve or reject contracts ratified by local unions and approve the procedure by which local unions vote on contracts, *id.*, Art. 19, Sec. 3. They attempt to reach a settlement when a local union is unable to avert a strike, and they must approve any strike from a local union under their purview, *id.*, Art. 50, Sec. 2. They oversee the creation of Education Committees within local unions and approve appointments of education representatives to those committees, Art. 27, Sec. 5-6. Further, and importantly, "only the delegates from the Local Unions in such regions shall nominate for their International Board Members." *Id.*, Art. 10, Sec. 2. As this explanation of the role's constitution duties show, most of these executive functions flow through the local unions within a region.

**c)** **Local 2320**

Local 2320, the National Organization of Legal Service Workers ("NOLSW"), is a local union of the UAW, which is national in scope. Having previously been an independent union, it

affiliated with the UAW in 1992. It has members working across the country. 70% of Local 2320 members work outside of Region 9A's geographical boundaries, but the local is headquartered in New York City, which falls into Region 9A. Local 2320 has a website hosted on the Region 9A website. https://region9a.uaw.org/uaw-local-2320-nolsw/. All Local 2320 officers, even those who work in bargaining units outside of Region 9A's geographical boundaries, are listed in the "About Us" section of Region 9A's website. See, e.g., https://region9a.uaw.org/uaw-local-2320-nolsw/news/statement-uaw-region-9a-locals-everyone-deserves-access-reproductive. In a June 25, 2022 "Statement from UAW Region 9A Locals," Local 2320 President Pam Smith is the second signatory. On Local 2320's website, on a page titled "Union Organization," is a flowchart showing the AFL-CIO above the UAW, which is above Region 9A, which above Local 2320, described as "[o]ver 100 local units across the country." This flowchart is also included as Exhibit A. Per Local 2320's own position, stated on a website hosted by Region 9A, all of Local 2320's units are part of Region 9A.

Region 9A International Representative Hyacinth Blanchard is the UAW organizer responsible for providing support to Local 2320. All communications with or requests to the UAW International Union are required to go through Ms. Blanchard. Ms. Blanchard works under the supervision of incumbent Region 9A supervisor Beverley Brakeman, who is running for reelection. During last year's referendum, Local 2320's ballots were tallied with Region 9A, where they made up just over 10% of all votes cast.

> **d)    Mr. Mancilla and Ms. Kohnert-Yount**

Plaintiffs are both UAW members. Mr. Mancilla helped organize the Harvard Graduate Students Union, winning recognition and serving as president of the UAW Local that that union became, Local 5118. He currently is a staff organizer for Local 2325, a legal services local in New York City (not to be confused with Local 2320). Ms. Kohnert-Yount is a member of Local 2320,

working at Texas RioGrande Legal Aid in Texas. She was previously a member of Local 5118, where she worked with Mr. Mancilla. Both Mr. Mancilla and Ms. Kohnert-Yount were excited about last year's referendum and were involved in campaigning for it.

On December 2, 2021, the court-appointed monitor completed counting the ballots. The final result was a resounding victory for direct elections, 63.7% in favor. Ms. Kohnert-Yount's local, Local 2320, was very supportive of direct elections, with 83.9% of its votes going for direct elections. These votes were tallied as part of Region 9A's total, contributing to Region 9A being the region that most supported direct elections, with 71.6% in favor. Exhibit B, Monitor's Referendum Report, 37.

After the referendum, UAW members began to plan for their inaugural direct elections. Mr. Mancilla, with his experience running a local union, considered running for Region 9A Director. In making this decision, Mr. Mancilla was encouraged by the fact that Region 9A had such strong support for direct elections, based on the referendum tallies that included the Local 2320 votes. He felt confident he could win over many of those voters who supported direct elections if he decided to run for Regional Director. Exhibit C, Mancilla Declaration ¶¶9-12. Mr. Mancilla consulted with Local 2320 members about the possibility of running and confirmed with them their understanding that they would be voting in Region 9A. They indicated that they assumed so, having gotten no indication to the contrary and having had their votes counted in Region 9A in the referendum and being told they would be part of Region 9A at the UAW Convention.

In July of 2022, after extensive consideration and preparation, Mr. Mancilla decided to run for Region 9A Director. Ms. Kohnert-Yount, who had worked with Mr. Mancilla, was excited about his campaign, and ultimately decided to serve as his campaign co-chair. She looked forward

to, as a Local 2320 member, organizing her coworkers to vote for him. Ms. Kohnert-Yount also decided to run for delegate from Local 2320 to the UAW Convention. 2320 was entitled to elect up to 10 delegates to convention. Members working at Legal Services of New York City/MFJ and Heartland Alliance in Chicago elected two delegates from their own units, and the rest of the Local's membership as a whole were entitled to elect up to six. No aspect of these at-large elections included consideration of the geographical location of these members' workplaces. The membership of Local 2320 elected four at-large delegates: Ms. Kohnert-Yount and Robert Garza, who both work at Texas RioGrande Legal Aid in Texas, Aimee VonBokel, who works at Lone Star Legal Aid in Texas, and Jordan Barbeau, who works at St. Andrew's Legal Clinic in Oregon.

After she was elected, Ms. Kohnert-Yount began preparing for convention, a preparation which occurred almost entirely within Region 9A. Region 9A organized a UAW Convention 101 for delegates, to which all Local 2320 delegates were invited. It took place on July 13, 2022, and both Region 9A Director Beverly Brakeman and Region 9A International Representative Hyacinth Blanchard were present. Ms. Blanchard is the international representative assigned to work with Local 2320. She works for Region 9A under the supervision of Ms. Brakeman. At convention, 2320 delegates, regardless of where they worked, were part of Region 9A. They registered with Region 9A, sat with Region 9A, received Region 9A shirts that they were directed to wear on the convention floor, where they were required to sit with the rest of Region 9A, and were part of the Region 9A nominating meeting.

It was at this Region 9A nomination meeting where Mr. Mancilla was formally nominated for 9A Region 9A Director. Ms. Kohnert-Yount and the other Local 2320 delegates were present for this. Ms. Kohnert-Yount had previously inquired about whether she would be attending the Region 9A or Region 8 nominating meeting, as she was considering nominating a Region 8

member for Regional Director. However, Local 2320 President Pam Smith told her that she was assigned to Region 9A and would be part of the Region 9A delegation at convention, and so would not be able to be part of the Region 8 nomination process, only the Region 9A process. The only regions that ended up with contested elections were Regions 1, 2B, 9, and 9A.

Based on all of this information, Mr. Mancilla, Ms. Kohnert-Yount, and the broader campaign had every reason to believe that Local 2320 members would all be voting in the election for Region 9A's Regional Director. This would have made sense, as the duties of a Regional Director flow almost entirely through the Local Union. The first time that either Mr. Mancilla or Ms. Kohnert-Yount got any fleeting indication that that was not the case was when a coworker of Ms. Kohnert-Yount, Robert Garza, called her on August 19, 2022. Mr. Garza was also a vice president of Local 2320. On the call, Mr. Garza told her that members of their bargaining unit would be voting in Region 8, not Region 9A. He did not follow up with any official information, or even any kind of written notice of this, so Ms. Kohnert-Yount was unsure on what authority he was saying this.

Absent further information, Mr. Mancilla's campaign proceeded on the assumption, based on all the other available information, that all Local 2320 members would be voting in the Region 9A election. On September 8, Mr. Mancilla's campaign hosted a Legal Service Workers Town Hall for members of Region 9A locals who worked in legal services, including all members of Local 2320. They still heard no indication from the Monitor or the UAW that these workers would not be allowed to vote for the Region 9A Director.

The first official indication of any sort that all Local 2320 members would not be permitted to vote for the Region 9A Director came on September 21, two months after convention and 26 days before ballots are due to be sent out, when the election monitor sent Mr. Mancilla an email

indicating that Local 2320 members would vote not based on their local, but on the basis of their specific worksites. The sole reason cited for this decision was a 1992 memorandum that was not readily available to the membership, and which was not included as part of the email containing this decision. Exhibit D, 1992 UAW Memorandum. This memorandum was, on information and belief, available to members of the International Executive Board, including Administrative Caucus candidates running for reelection like incumbent Region 9A Director Beverley Brakeman. On September 27, 20 days before ballots were due to come out, Mr. Garza sent an email to Local 2320 members at Texas RioGrande Legal Aid stating that they would be voting in Region 8. A letter dated the same day to Local 2320 President Pamela Smith from Todd Brien, Executive Administrative Assistant, indicates that Ms. Smith had asked for clarification on where members would be voting. The letter states that the UAW will direct the election vendor to issue ballots to Local 2320 members based on their location-specific worksites. Exhibit E, Kohnert-Yount Declaration.

Immediately after this decision was announced, Mr. Mancilla brought his concerns to the Monitor, requesting a meeting within a day of receiving the September 21 email and submitting a detailed appeal within a week on September 28. On October 7, the Monitor responded to this appeal, refusing to change their decision. Stating that the fact of "the assignment of Local 2320 members to Region 9A for the purposes of the recent Constitutional Convention," meaning that they were unable to nominate Regional Director candidates in any region other than Region 9A, was notwithstanding, the monitor asserted that "Local 2320 is a uniquely autonomous, self-servicing Local Union that handles its own collective bargaining agreements and no UAW Regional Director (or International staff) has ever intervened in Local 2320 collective bargaining

or grievance handling functions" as a reason for holding to their position. Exhibit F, Monitor Decision.

The accuracy of this statement aside (what little support Local 2320 got from the UAW was in the form of an International Representative, Hyacinth Blanchard, who was assigned to Region 9A and was a subregional director), the overall lack of support that the International Union provided to Local 2320 that has forced it to be "autonomous" and "self-sustaining" is no reason to continue that practice, much less a reason to violate the rights of thousands of union members. Further, as discussed below, past practice is not a legally compelling factor in legal analysis under Section 101(a) of the Labor-Management Reporting and Disclosure Act ("LMRDA").

## II.     Legal Standard

In order to succeed on a motion for a preliminary injunction, Plaintiffs must show (1) irreparable injury, with no adequate remedy at law, and (2) a likelihood of success on the merits. *NRDC v. Winter*, 555 U.S. 7, 20 (2008). Once that has been established, the Court may consider (3) the balance of hardships between the parties to the case, and (4) the public interest, or the interests of nonparties. *Id.* The LMRDA explicitly allows injunctions to be used as relief for violations of Section 101 of the LMRDA. 29 U.S.C. § 412. Similarly, the factors considered for a temporary restraining order are "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay" *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

## III.     Plaintiffs Have a Strong Likelihood of Success on the Merits

Plaintiffs are very likely to succeed on the merits. As laid out below, scattering of Local 2320 members among various Regions despite the power of Regional Director, as laid out in the

Constitution, flowing primarily through the local, violates the equal right to vote of Local 2320 members like Plaintiff Kohnert-Yount both individually and collectively. Further, the past practice pointed to by the monitor as the chief reason for this decision is both not particularly firmly established and, under the law, does not offer much weight in the relevant legal analysis.

Section 101 of the LMRDA guarantees that "[e]very member of a labor organization shall have equal rights and privileges within such organization…to vote in elections or referendums of the labor organization…" 29 U.S.C. §411(a)(1). "When a union provides its membership with the right to vote on a certain matter, the right must be extended on an equal basis and in a meaningful manner." *McGinnis v. Teamsters Local 710*, 774 F.2d 196, 199 (7th Cir. 1985) (citing *Christopher v. Safeway Stores*, 644 F.32 467, 470 (5th Cir. 1981); *Alexander v. IUOE*, 624 F.2d 1235, 1240 (5th Cir. 1980); *Bunz v. Moving Picture Machine Operators' Protective Union*, 567 F.2d 1117, 1121 (D.C. Cir. 1977)). Courts have also recognized that facially neutral rules that nevertheless result in disparate treatment of union members and have discriminatory effect can violate Title I. *McGinnis*, at 200; *American Postal Workers Union v. American Postal Workers Union*, 665 F.2d 1096, 1104 (D.C. Cir. 1981); *Alvey v. General Electric*, 622 F.2d 1279 (7th Cir. 1980); *Trail v. Teamsters*, 542 F.2d 961, 966 (6th Cir. 1976); *Burton v. Arons*, 339 F.2d 371 (2d Cir. 1964).

Here, the right to vote on the Regional Director overseeing their local is being denied to Local 2320 members who work in units outside the Northeast in a disparate and discriminatory manner. The right of such members to vote for a different Regional Director does not cure the violation; that is not a right in any "meaningful manner" since such Regional Directors are not the ones with relevant power to affect those members' interests. Regional Directors "shall have direct supervision over all organizational activities within the region from which s/he is elected." UAW Constitution, Art. 13 Sec. 23. Regional Directors, as noted above, sign off on contracts, approve

strikes, and assign and oversee international staff and use of international funds to locals, among many other responsibilities. For instance, the international staff representative assigned to Local 2320, who is the servicing representative for units across the country, including locations within Region 4 and the soon-to-be Region 6, is Hyacinth Blanchard, who is under the supervision of the Region 9A Director as the Region 9A Subregional Director, and has been pulled to work on other Region 9A units and campaigns. If a member of Local 600 is concerned about the level of support from the international union, or is angry that a strike she voted to authorize was not allowed to occur or that a contract she supported was vetoed, she now has the right to vote out her Regional Director. By contrast, if a Local 2320 member who lives and works for a legal services provider in Texas is frustrated that the Local does not get the support from the international union to have more than two staffers covering the entire Southwest and Southeast, or is mad that their unit's decision to strike was vetoed by the Regional Director overseeing their Local, they do not have this recourse, as the Region 8 Regional Director is not the IEB member responsible for assigning staff to Local 2320. Certainly, the Region 8 Director would have no reason to even care about Local 2320, with the Local being the responsibility of another Regional Director and its voters in Region 8, having been diluted among the regions through this decision, being so few in number. It is unclear what, if any, authority the Region 8 Regional Director does have over the Texas-based 2320 member, such that she should have a vote over who occupies that office. But certainly, denying a Texas-based 2320 member a vote over the Regional Director who oversees their Local constitutes discriminatory treatment that violates Section 101(a) of the LMRDA.

The case law on violations of the equal right to vote supports this conclusion. In *McGinnis*, a Local Union based in Chicago had members across the country, living and working as far away as California. Despite this fact, the union required members to come to the local union hall to vote.

The union argued that everyone had an equal right to vote, and that the California members were welcome to come to Chicago for the meetings. The Seventh Circuit made clear, however, that geography could not be used as a barrier to the equal rights of members to vote. The Court found that the "practical effect" of this rule was that the facially neutral rule had a discriminatory effect on those members who lived and worked far from the Local. *McGinnis*, at 201. In *Trail v. Teamsters*, 542 F.2d 961 (6th Cir. 1976), Michigan-based members brought suit because, despite being allowed to vote on national and regional contracts that affected them, they were not permitted to vote on a state-specific Michigan Rider. The Sixth Circuit rejected the Defendants' argument that what they had been allowed to vote on was sufficient; their inability to vote on an issue that had import to them presented a possible violation of the statute.

Defendants' decision to scatter the votes of Local 2320 members across all regions unlawfully discriminates against those members as a group. 70% of Local 2320's membership are having their ability to vote over the Region 9A director taken away by this decision. Contrary to the purpose of the LMRDA, that unions are to be "responsive to the will of the membership," *Sheet Metal Workers v. Lynn*, 488 U.S. 347, 351 (1989), this decision ensures the Region 9A director need not care about the needs and interests of Local 2320. Unlike other Locals, whose members all get to vote for the same Regional Director who oversees their Local, 2320 members are being denied that right.

Courts have recognized that the equal right to vote belongs not only to individuals but also to groups within the union bonded together by some shared interest. *Bunz v. Moving Picture Machine Operators' Protective Union*, 567 F.2d 1117, 1121 (D.C. Cir. 1977). The *Bunz* Court, for instance, held that, where a union held a vote on a particular question and then, after the vote was called, issued an interpretation changing the margin necessary for the vote to succeed, they had

12

violated the equal right to vote of the political group opposed to the change. *Id*. At 1121-23. Despite the fact that the members bringing suit had been able to vote, that formality was insufficient to satisfy the statutory right to vote. "A union cannot immunize itself against charges of discrimination simply by affording each member the mere naked right to cast a ballot; the right each member has to vote must be meaningful." *Id.* At 1121. The Court held that while the plaintiff was "allowed to cast a ballot," the ballots of those who opposed the measure "were deprived of their effectiveness." *Id.*

Similarly, here, while all members of Local 2320 enjoy the "mere naked right to cast a ballot," those ballots do not afford a meaningful right to vote. "Discrimination is most invidious where, as here, it is applied to prevent a group of members from voting…on matters that vitally affect them." *Alvey v. General Electric*, 622 F.2d 1279, 1287 (7th Cir. 1980). Over two thirds of Local 2320 members are being prohibited from voting in the Region 9A election, where their votes would be able to meaningfully affect the various ways a Regional Director can impact their working lives. Furthermore, not only will the vast majority of Local 2320 members be disallowed from participating in the relevant Regional Director election, a majority of those displaced have been reassigned to regions in which there is no competitive election, with a single candidate running unopposed. Such blatant gerrymandering cannot possibly give rise to a "meaningful" right to vote. All Local 2320 members should be allowed to vote in the same region to ensure that their Regional Director, the executive over the particular subdivision of the UAW that their Local is a part of, is "democratically governed and responsive to the will of the union membership as expressed in open, periodic elections." *Finnegan v. Leu*, 456 U.S. 431, 441 (1982).

The weakening of the collective vote of Local 2320 members is exacerbated by the fact that this scattering of their votes is happening after the election process had already started. Ms.

Kohnert-Yount and every other Local 2320 delegate were assigned to Region 9A at the UAW Convention. Exhibit E, Kohnert-Yount Declaration, ¶¶20-34. They could only attend the Region 9A meeting and could only nominate candidates for Region 9A. This means that she and her other delegates, representatives of their entire Local 2320 membership, were only permitted to nominate candidates for Region 9A, and yet now are being told that they cannot vote in that election, one of the few contested elections, and instead must vote in, in Ms. Kohnert-Yount's case, the Region 8 election, which is uncontested. Ms. Kohnert-Yount was considering nominating a candidate for Region 8 Director but could not because she was assigned to Region 9A nominating meeting. Aside from all the other reasons why all Local 2320 members are entitled to vote in the Region 9A election, Defendants cannot alter the voter base mid-election. If nominations were conducted with all of Local 2320 being part of 9A, then that must remain the case through the end of the election. To do otherwise, especially when that otherwise involves shifting a majority of Local 2320's membership into uncontested elections that their representatives at Convention were not allowed to nominate candidates for, would be a naked violation of their equal right to vote and, in denying them the possibility of leaders of their own choosing, their right to free speech.

Defendant Monitor's decision upholding this decision relies almost entirely on a past practice that is inconsistently followed, and which is largely irrelevant under this particular legal analysis. "Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect." 29 U.S.C. § 411(b). Here, Defendants decision is not even based on the Constitution, but on a 30-year-old Memorandum that was not even publicly available. Exhibit D, 1992 UAW Memorandum. This letter was from a senior UAW staffer to the leadership of NOLSW, as part of a codification of NOLSW's cohesive national identity as a union, borne from its time both as an independent union

and as part of District 65, a previously independent union. Exhibit D. As part of that arrangement, per this letter, NOLSW was assigned to Region 9A, and members of NOLSW (now Local 2320) within a particular geographic region were apportioned to that region for the purpose of electing convention delegates, and those delegates were to elect RDs in their region. That is the extent of its discussion of the relationship between Local 2320 and the various regions. The letter does not say anything that would change the relationship of Regional Directors to the units of 2320, or in any way suggest that anyone but the 9A RD would be the responsible RD for the Local. Nor does it address how the convention delegate principle it lays out could be reconciled with the constitutional mandate that "only the delegates from the Local Unions in such regions shall nominate and vote for their International Board Members." Exhibit D. Past practice cannot stand up to the protections afforded by statute, particularly when the union's constitution is on the side of the statute.

Further, this memorandum was not followed particularly closely. At this summer's convention, Local 2320 did not elect delegates based on the geographical distribution of members. Aside from two large units in New York and Chicago that elected their own delegates, Local 2320 elected delegates at large nationwide. Those at-large delegates came from bargaining units situated in Texas and Oregon. Nevertheless, those delegates attended Region 9A's delegate training and were told, even after they asked if they could sit with other delegates from their states, that they were assigned to Region 9A and would sit with Region 9A. They were told to attend the Region 9A nominations meeting, meaning that they were unable to nominate candidates for Regional Director in other regions where Defendants now say they must vote. They stayed in the Region 9A hotel. They were even given, and told to wear, Region 9A shirts on the convention floor. That Local 2320 was treated as part of Region 9A at convention is no surprise; as the evidence in the

statement of facts demonstrates, Local 2320 is, in whole, seen as and treated as part of Region 9A. Its website is hosted on the Region 9A website, its president signs statements from "Region 9A Locals," and it has posted a flowchart on its website explicitly establishing that all of its units "across the country" are part of Region 9A. Exhibit A. https://region9a.uaw.org/uaw-local-2320-nolsw/union-organization. That page states explicitly that "NOLSW/UAW Local 2320 is part of Region 9A." Recent past practice, including the only past practice from the direct election era of the UAW, involves all of Local 2320 being treated as part of Region 9A. Defendants cannot rely on any past practice to forgive violations of statute.

### IV.    Between Both the Nature of the Injury and the Impending Election, Plaintiffs Will Suffer Irreparable Harm Absent and Injunction

The harm that will be done absent a preliminary injunction and temporary restraining order is immense and irreparable. *Per se*, there is no adequate legal remedy for the loss of the right to democratic control of a labor organization. The loss of that right is irreparable injury. *Babler v. Futhey*, 618 F.3d 514 (6th Cir. 2010) (relying on *Sheet Metal Workers v. Lynn*, 488 U.S. 347, 355 (1988)). Courts have previously issued preliminary injunctions to stop even threatened violations of free speech and voting rights. See, e.g., *Navarro v. Gannon*, 385 F.2d 512 (2d Cir. 1967).

In this particular circumstance, the imminent nature of the election only heightens the risk of irreparable harm. The first distribution of ballots is scheduled to occur on October 17, less than a week away and less than two weeks after a final decision was made by the monitor. Absent equitable relief, this election will move forward without Local 2320 members like Ms. Kohnert-Yount having a meaningful vote for Regional Director, which would cause irreparable harm to Mr. Mancilla in his campaign for those votes. Further, absent immediate action, Local 2320 members will be sent ballots for other Regions. Even in the unlikely event resolution occurred quickly enough to prevent the commingling of those ballots with the larger pool of ballots (though since

many of those races are uncontested, such commingling would not affect the results), such a result could confuse many of these voters who would not understand why they are receiving a second, different ballot for Regional Director. Equitable relief is necessary to ensure that this election can be conducted fairly.

### V.      A Balancing of Equities Favors the Plaintiffs

A balancing of the equities favors Plaintiffs. Defendants will not be harmed by ensuring that Local 2320 members vote in the election that most affects them. Plaintiffs' interest in an equal right to vote is enormous, with no countervailing interest from Defendants, much less one enshrined in statute. Further, should Plaintiffs ultimately prevail, there will be serious harm not only to Plaintiffs but also to Defendants, in that they will have conducted a now void election that could result in the necessity of a rerun election, in addition to the harm caused by the lack of a Region 9A Director pending the outcome.

### VI.      Non-parties Will Not Be Harmed by a Temporary Restraining Order

Non-parties will not be harmed, and will in fact benefit, from a temporary restraining order. The benefit enjoyed by Ms. Kohnert-Yount to ensuring that she gets the correct ballot now, while it can still count, is a benefit enjoyed by all of the non-party Local 2320 members as well. In addition, the benefit provided by ensuring that these members are not sent ballots that may soon need to be replaced creates a substantial benefit, not only of preventing potential intractable problems for other Regional Director elections but avoiding voter confusion of a group of voters getting two different ballots for the same election in different regions.

### VII.      There is a Compelling Public Interest in Favor of Meaningful Union Democracy

The LMRDA establishes a clear public policy in favor of union democracy, and protecting the rights enshrined by LMRDA Section 101 serve the public interest. The consent decree that started the process that has resulted in these direct elections made clear that "honest and duly

17

elected officials of the UAW are the best equipped to collectively bargain on behalf of its members and to enforce said agreements vigorously and aggressively." Dkt. 10, *United States v. UAW*, 2:20-cv-13293-DML-RSW (E.D. Mich. January 29, 2021). There being a public interest in such duly elected officials, ensuring that these Local 2320 members are able to elect the Regional Director with a meaningful role to play in their local union is in the public interest.

<u>Conclusion</u>

For the foregoing reasons, Plaintiffs request this court order Defendant UAW to send all Local 2320 members ballots for the Region 9A regional director election and, pending the outcome of this motion, enjoin Defendants from sending Local 2320 members ballots for any non-Region 9A regional director election.

Respectfully submitted,

Dated: October 12, 2022                 By: /s/ *Ann Curry Thompson*
                                                   One of Plaintiffs' Attorneys

Ann Curry Thompson, P27242
Kelman Loria, PLLC
18675 Bretton Drive
Detroit, Michigan 48223
(313) 736-3451

Thomas H. Geoghegan
Michael P. Persoon
Will Bloom (admission application forthcoming)
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511