UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRANDON MANCILLA, *et al.*,

        Plaintiffs,               Case No. 22-cv-12443
                                      Hon. Matthew F. Leitman

v.

NEIL M. BAROFSKY, *et al.*

        Defendants.

_____/

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER (ECF No. 4)

This action arises out of an election currently being conducted by Defendant the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW"). The election is being overseen by a court-appointed monitor for the UAW, Defendant Neil M. Barofsky. During the election, UAW members will elect nine Regional Directors to serve on the union's International Executive Board (the "IEB"). As the name implies, each Regional Director represents a different geographic region of the country.

In connection with the pending election, almost all UAW members are assigned to vote in the geographic region of the country in which their local union chapters are headquartered. For instance, all of the members of a local union that is

headquartered in Ohio will vote for the Regional Director who will represent the region that includes Ohio.

But the members of one of the UAW's local unions, the National Organization of Legal Service Workers, UAW Local 2320 ("Local 2320"), will not vote under that arrangement. Instead of voting for the Regional Director who will represent the region in which Local 2320 is headquartered, each member of Local 2320 will vote for the Regional Director who will represent the region in which the member works. Because the members of Local 2320 are located in different UAW regions throughout the country, they will vote for different Regional Directors.

Plaintiffs Brandon Mancilla and Alexandra Vail Kohnert-Yount claim that the manner in which the UAW has assigned the members of Local 2320 to vote in the Regional Director election deprives them of their equal right to vote and to speak as guaranteed by Section 101 of the Labor Management Reporting and Disclosure Act (the "LMRDA"), 29 U.S.C. §§ 411(a)(1)-(2). In a motion now before the Court, they seek a preliminary injunction requiring the UAW and Barofsky to have the members of Local 2320 vote for the Regional Director who will represent the region in which that Local is headquartered. (*See* Mot., ECF No. 4.) For the reasons explained below, the motion is **DENIED**.

2

# I

## A

The UAW is one of "one of the largest and most diverse unions in North America." (https://uaw.org/about/.)  It is comprised of "more than 600 local unions" that have "more than 400,000 active members and more than 580,000 retired members in the United States, Canada and Puerto Rico." (*Id.*)  For administrative purposes, the UAW is divided into nine geographic "regions." (https://uaw.org/regions/.)  Relevant here, Region 9A "covers eastern New York (including the New York City metropolitan area, the Hudson Valley and the Capital District area), Connecticut, Massachusetts, Rhode Island, New Hampshire, Vermont, Maine and Puerto Rico." (*Id.*)

Each UAW region has a Regional Director who serves as a member of the IEB. (*See* Compl. at ¶20, ECF No. 1, PageID.4.)  Regional Directors "have many executive functions in their regions, in addition to the legislative function they have as [] members [of the IEB]." (*Id.*)  For example, Regional Directors typically:

> [S]upervise all international staff assigned to their region, approve establishment and changes of local union dues, approve transfers of funds from local to local within their region, approve expenditures of local union's new member orientation fund, and make recommendations to the [IEB] on whether to appropriate international union funds to defray the expenses of a local union.
>
> They [also] make recommendations to the IEB on whether to approve or reject contracts ratified by local unions and

> approve the procedure by which local unions vote on
> contracts. [And they] attempt to reach a settlement when
> a local union is unable to avert a strike, and they must
> approve any strike from a local union under their purview.

(*Id.* at ¶¶ 21-22, PageID.4; internal citations omitted).

## B

Local 2320 is one of the local union chapters within the UAW. Its structure is unlike that of almost all of the UAW's other local chapters. Almost every other local chapter is made up of members who live and work in the same region in which the chapter is headquartered. However, while Local 2320 is headquartered in UAW Region 9A, its members live and work "throughout the United States" – in many different UAW regions. (Decl. of Gordon Deane, Assistant Director of UAW Region 9A, at ¶5, ECF No. 19-4, PageID.501.)

Local 2320 also has a unique history:

> [It was] originally established in 1978 as the National
> Organization of Legal Services Workers (NOLSW) as an
> independent labor organization. When NOLSW was
> established, it was comprised of pre-existing local unions
> representing employees in civil legal services programs
> around the country.

> In 1981, NOLSW affiliated with District 65, UAW.
> District 65, UAW itself was an independent labor
> organization which was in the process of affiliating with
> the International Union, UAW ("UAW") in 1981. District
> 65 contained multiple bargaining units spread across a
> dozen states within the United States. District 65 became
> more fully integrated into the UAW in 1987.

> As part of NOLSW's original affiliation agreement with District 65, NOLSW's autonomy, jurisdiction, and national structure were explicitly recognized and guaranteed by District 65. After a prolonged period of financial difficulty, in 1992, District 65 went through a financial restructuring under the protection of Chapter 11 of the U.S. Bankruptcy Code and its constituent bargaining units were ultimately dispersed into different geographical regions of the UAW and were chartered as independent UAW Locals.
>
> Initially, the planned restructuring of District 65 by the UAW did not contemplate NOLSW continuing as a nation-wide entity, but instead, separate the various units/worksites of NOLSW in different UAW regions and either create new local unions or place them in other existing UAW local unions. After discussions and negotiations between the UAW and NOLSW, in November 1992 an agreement was reached which provided that NOLSW would be: (1) chartered as an amalgamated UAW Local Union and administratively placed within existing UAW Region 9A and (2) the various NOLSW-represented worksites spread across the United States would constitute unit(s) of the newly chartered amalgamated UAW Local Union.

(*Id.* at ¶¶ 5-8, PageID.501-503.)  This agreement between the UAW and the NOLSW was memorialized in a memorandum dated November 17, 1992 (the "1992 Memorandum"). (*See id.* at ¶8, PageID.503.)  Local 2320 emerged from the 1992 Memorandum. (*See id.*)

Local 2320's unique history and structure have led to an unusual relationship between the Local and the UAW's Regional Directors over the years.  Those directors have not performed for Local 2320 the typical functions of directors

outlined above (in Section (I)(A)).    Instead, because "Local 2320 operates autonomous[ly] from any UAW region, whether it is UAW Region 9A or any other UAW Region [….] [n]o UAW Regional Director or any UAW International Representative has any direct involvement in Local 2320's collective bargaining, contract administration or grievance handling. Similarly, no UAW Regional Director, including the Region 9A Director, has sought to intercede in any matter involving Local 2320 contract administration, grievance handling or organizing." (Decl. of Pamela Smith, President of Local 2320, at ¶3, ECF No. 19-3, PageID.493.) Thus, even though Local 2320 is headquartered in Region 9A, "[o]ther than serving as the liaison between Local 2320 and the UAW on items such as requesting technical assistance for Local 2320 from the Legal, Research, Social Security or other departments of the International Union, UAW, the Region 9A Director has no other involvement in the affairs of Local 2320 members, irrespective of geography." (*Id.* at ¶7, PageID.495. *See also* Deane Decl. at ¶¶ 11, 13, ECF No. 19-4, PageID.504-505 (same).)

In addition, the manner in which Local 2320 has participated in the election of Regional Directors has differed from the manner in which other local chapters have participated in those elections.    In the past, Regional Directors have been nominated and elected at regional conventions. (*See*, *e.g.*, Smith Decl. at ¶8, ECF No. 19-3, PageID.495.)    Almost every other UAW local chapter sent all of its

delegates to the regional convention for the region in which its headquarters was located. Local 2320 did not do that. Instead, "Local 2320 delegates attended regional conventions for the purpose of nominating and electing the UAW regional director for the geographic area where their respective worksites [were] located." (*Id*.) This voting arrangement flowed directly from the 1992 Memorandum, which provided in relevant part:

> The per capita membership of NOLSW geographically located in a UAW Region will be allocated to each such UAW Region and will be considered as a single unit or units within such Region for the purpose of electing Convention Delegates. NOLSW Delegates to the UAW Constitutional Convention will vote for the Officers of the International Union and vote on all matters coming before the Convention. The Units will cast votes for the Regional Directors based on the reported per capita in each respective Region.

(1992 Memo., ECF No. 4-4, PageID.515.)

## C

In 2021, the UAW entered into a consent decree with the United States Department of Justice that required, among other things, the UAW to hold a referendum allowing its members to vote on "whether to switch from a system of election UAW leadership through votes by delegates at [a] convention to [a] one member, one vote system of direct elections" (the "Referendum") (Compl. at ¶¶ 7, 9, ECF No.1, PageID.3.)   The consent decree further required the appointment of a monitor to ensure that the Referendum and any subsequent direct elections complied

7

with the terms of the consent decree. (*See United States v. UAW*, E.D. Mich. Case No. 20-cv-13292, at Dkt. 10.)  Another Judge of this Court appointed Defendant Barofsky to serve as that monitor. (*See id.* at Dkt. 53.)

The UAW held the Referendum from October to December 2021. (*See* Compl. at ¶10, ECF No. 1, PageID.3.)  The Referendum passed. (*See id.* at ¶13, PageID.3.)  As relevant here, that meant that Regional Directors would no longer be chosen by delegates at regional conventions.  Instead, candidates for Regional Director would first be nominated by delegates at regional conventions and would then stand for election by the members.  Simply put, the passage of the Referendum meant that the members would have the final vote on who served as Regional Director.

### D

Kohnert-Yount is a member of Local 2320. (*See id.* at ¶2, PageID.1.)  She lives in Texas. (*See id.*)  Texas is not in Region 9A.  Mancilla is a member of a different local, Local 5118. (*See id.* at ¶1, PageID.1.)  He lives and works in Region 9A. (*See id.*)

"In July of 2022, Mancilla decided to run" to be Region 9A's Regional Director. (*Id.* at ¶26, PageID.5.)  Kohnert-Yount "eventually became [Mancilla's] campaign cochair." (*Id.* at ¶27, PageID.5.)  As noted above, in order to be placed on the ballot for Region 9A Director, Mancilla had to be nominated for that position

by the delegates at the Region 9A regional convention.  He attended that convention and sought the nomination. (*See* Mancilla Decl., ECF No. 4-3, PageID.113.)

Notably, the UAW assigned all of Local 2320's delegates to the Region 9A regional convention. (*See* Compl. at ¶33, ECF No. 1, PageID.5-6.)  This was a departure from the historical practice – described above – in which the UAW had assigned Local 2320's delegates to attend the regional conventions for the regions in which the delegates worked. (*See*, *e.g.*, Smith Decl. at ¶8, ECF No. 19-, PageID.495.)  Because all of Local 2320's delegates were required to attend the Region 9A regional convention, they did not have the opportunity to nominate candidates for Regional Director in any other region. (*See* Compl. at ¶40, ECF No. 1, PageID.6)

 At Region 9A's regional convention, Mancilla "was formally nominated for [] Region 9A Director." (*Id.* at ¶34, PageID.6.)  Kohnert-Yount and the other Local 2320 delegates were present for Mancilla's nomination. (*See id*.)  A second candidate was also nominated for Region 9A's Regional Director position. (*See id.* at ¶56, PageID.9.)  Thus, "Region 9A [has] a closely contested election between two candidates with distinct visions for the union." (*Id.*)

## E

Following Mancilla's nomination, his "campaign proceeded to campaign for the votes of all Local 2320 members" regardless of their geographic location. (*Id.* at

¶42, PageID.7.)  He sought the votes of all Local 2320 members from around the country because he believed, based upon the fact that the UAW assigned all Local 2320 delegates to attend the Region 9A regional convention, that all Local 2320 members would be voting in the Region 9A Regional Director election. (*See id. See also* Mancilla Decl., ECF No. 4-3.)

But, on September 21, 2022, "two months after [the Region 9A regional] convention and 26 days before ballots [were] due to be sent out," Mancilla received formal notice from Barofsky that "Local 2320 members would vote […] on the basis of their specific worksites." (Compl. at at ¶44, ECF No. 1, PageID.7.)  That meant that instead of voting all together in Region 9A, the members of Local 2320 would be required to vote in several different regions. "The sole reason [Barofsky] cited for this decision was [the] 1992 [M]emorandum." (*Id.* at ¶45, PageID.7.)

"Mr. Mancilla quickly brought his concerns about this to the attention of [Barofsky], requesting a call within a day of receiving the email on September 21 and submitting a detailed appeal within a week." (*Id.* at ¶49, PageID.8.) Barofsky denied Mancilla's appeal on October 7, 2022. (*See id.* at ¶50, PageID.8.) Barofsky's decision, in whole, provided as follows:

> Thank you again for meeting with us last week to discuss your pre-election protest and for submitting the letter brief in support of the same. I write to inform you that the Monitor team has completed its additional investigation prompted by your pre-election protest and has arrived at our original conclusion.

We recognize that Section 101(a)(1) of the [Labor-Management Reporting and Disclosure Act (the "LMRDA")] guarantees that "[e]very member of a labor organization shall have equal rights and privileges within such organization…to vote in elections or referendums of the labor organization…" and that these rights and privileges "must be extended on an equal basis and in a meaningful manner." *McGinnis v. Teamsters Local 710*, 774 F.2d 196, 199 (7th Cir. 1985) (citations omitted). Nonetheless, notwithstanding the assignment of Local 2320 members to Region 9A for the purposes of the recent Constitutional Convention – which was not a byproduct of the Referendum result as had been posited – we have concluded that the practice for the past 30 years is consistent with the LMRDA, case law, and the UAW Constitution. We understand that Local 2320 is a uniquely autonomous, self-servicing Local Union that handles its own collective bargaining agreements and no UAW Regional Director (or International staff) has ever intervened in Local 2320 collective bargaining or grievance handling functions. Local 2320 members—70% of whom are employed at worksites outside of Region 9A—have historically engaged in regional workshops and regional political and community affairs activities based on the geographic location of their worksite. As such, we think the decision to maintain the 30-year practice of Local 2320 members voting according to where they are geographically located is well-supported and would not deprive any member of the meaningful right to vote.

Accordingly, for the purpose of voting in the upcoming 2022 UAW International Officer Election, members of Local 2320 will be allocated to the UAW region in which they are geographically located. Under Section 9 of the Official Rules for the 2022 UAW International Officer Election, this is the Monitor's final determination with respect to your preelection protest. You have now exhausted your internal remedies and may properly seek redress with the Secretary of Labor and OLMS if you choose to do so. Election Rules at 9-5.

(ECF No. 4-6, PageID.121.)   Ballots for the election were set to be sent out on October 17, 2022. (*See* Compl. at ¶58, ECF No. 1, PageID.9.)

## II

On October 12, 2022, Mancilla and Kohnert-Yount filed this action against the UAW and Barofsky.  They claim that Barofsky's decision to "divide[] up the vote of UAW Local 2320 members" among several different geographic regions "has the intent and effect of dissipating the vote[,] weakening the influence of Local 2320[,] and discriminat[ing] against Local 2320." (*Id.*, PageID.1.)

Mancilla and Kohnert-Yount bring two claims against the Defendants under Title I of the LMRDA.  Count I is titled "Equal Right to Vote." In full, it alleges as follows:

> 59. Section 101 of the [LMRDA] states that "[e]very member of a labor organization shall have equal rights and privileges within such organization…to vote in elections or referendums of the labor organization…" 29 U.S.C. §411(a)(1).

> 60. "When a union provides its membership with the right to vote on a certain matter, the right must be extended on an equal basis and in a meaningful manner." *McGinnis v. Teamsters Local 710*, 774 F.2d 196, 199 (7th Cir. 1985)[.]

> 61. By denying Local 2320 members like Ms. Kohnert-Yount the right to vote over the Regional Director who oversees her local union, Defendant UAW has violated her equal right to vote under federal law.

12

62. Further, by denying a majority of Local 2320's membership the right to vote over the Regional Director who oversees their local union, Defendant UAW has diminished the collective voting power of this group in violation of the statute.

63. Defendant UAW's actions, in both the individual and collective denial of the equal right to vote of Local 2320 members like Ms. Kohnert-Yount, violate federal law.

64. Defendant UAW's actions harm Mr. Mancilla in removing from the list of those who, if the direct election referendum is any indication, would likely have strongly supported him.

(*Id.* at ¶¶ 59-64, PageID.9-10.)

Count II is titled "Equal Right to Speak."  It alleges as follows:

67.  Section 101(a)(2) of the LMRDA guarantees union members the right to "express any views, arguments, or opinions…" 29 U.S.C. §411(a)(2).

68. The Supreme Court has held that one vital way that union members exercise their right to free speech is through electing their leadership. *Sheet Metal Workers v. Lynn*, 488 U.S. 347, 355 (1989).

69. In scattering 70% of Local 2320 members to the voter rolls of Regions whose directors do not oversee their local, over half of whom are in regions that do not have contested elections, their ability to exercise free speech through electing leaders of their own choosing is being infringed.

(*Id.* at ¶¶ 67-69, PageID.10-11.)

As relief for both Counts, Mancilla and Kohnert-Yount seek, among other things, (1) a "[d]eclaratory judgment that disallowing the majority of Local 2320 members who work outside [of Region 9A] from voting for the Region 9A Director is a violation of the equal right to vote" and the equal right to speak under the LMRDA and (2) an order requiring Defendants to send "all members of Local 2320 […] ballots for Region 9A Director." (*Id.* at ¶¶ 65, 70, PageID.10-11.)

Mancilla and Kohnert-Yount have also filed a motion for a preliminary injunction and temporary restraining order seeking this same relief. (*See* Mot., ECF No. 4, PageID.34: "Plaintiffs request this court order Defendant UAW to send all Local 2320 members ballots for the Region 9A regional director election and, pending the outcome of this motion, enjoin Defendants from sending Local 2320 members ballots for any non-Region 9A regional director election.")  The Court set an accelerated briefing schedule for the motion (*see* Order, ECF No. 12), and it held a video hearing on the motion on October 25, 2022.

### III

A preliminary injunction "is an extraordinary and drastic remedy." *S. Glazer's Distribs. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). Although the movant "is not required to prove his case in full at a preliminary injunction hearing," *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th

Cir. 2007), a preliminary injunction should not "be granted lightly." *S. Glazer's*, 860 F.3d at 849.

A district court balances four factors when considering a motion for a preliminary injunction or a temporary restraining order: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Id.* (quotations omitted). "[T]hese are factors to be balanced, not prerequisites to be met." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[N]o one factor is controlling." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

Finally, "[i]n addition to demonstrating a likelihood of success on the substantive claims, a plaintiff must also show a likelihood of success of establishing jurisdiction." *Memphis A. Philip Randolph Institute v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021). "If a plaintiff cannot show a likelihood of jurisdiction, then the court [should] deny the preliminary injunction." *Id.*

## IV

### A

The Court first addresses whether Mancilla and Kohnert-Yount have shown a likelihood that the Court has jurisdiction over their claims. The Court's jurisdiction

turns on which Title of the LMRDA – Title I or Title IV – the claims should be brought under. "Both Titles I and IV address the right to vote in a [union] election; however, Title I suits may be initiated in district court, whereas the enforcement provisions for Title IV require the litigant to file a complaint" with the Secretary of Labor. *Knisley v. Teamsters Local 654*, 844 F.2d 387, 390 (6th Cir. 1988).

The Sixth Circuit has described Titles I and IV as follows:

> Title I of the LMRDA and specifically section 101, 29 U.S.C. § 411, is the "Bill of Rights" for union members. In relevant part, section 101 provides that union members "shall have equal rights ... to nominate candidates, [and] to vote in elections or referendums of the labor organizations...." 29 U.S.C. § 411(a)(1). Section 102 is the enforcement provision for Title I violations and provides in part that "[a]ny person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 412.

> Title IV of the LMRDA, 29 U.S.C. § 481 *et seq.,* governs the election of union officers on the local, national and international levels. Section 401(e) of Title IV specifically addresses the nomination and eligibility of candidates for union offices. 29 U.S.C. § 481(e).  In contrast to Title I, which allows union members to file suit in federal district court, the enforcement provisions of Title IV provide that a union member may file a complaint with the Secretary of Labor after fulfilling certain procedural prerequisites. 29 U.S.C. § 482(a). The Secretary is then required to investigate the complaint, and must file suit in federal district court to set aside the election if "he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied...." 29 U.S.C. § 482(b). Congress also included in Title IV an

exclusivity provision contained in section 403 which provides in relevant part:

> Existing rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this subchapter. The remedy provided by this subchapter for challenging an election already conducted shall be exclusive.
>
> 29 U.S.C. § 483. Relying on this provision, the Supreme Court has held that Title IV "'sets up an exclusive method for protecting Title IV rights,' and that Congress 'decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV.'" *Local No. 82, Furniture & Piano Moving Drivers v. Crowley,* 467 U.S. 526, 540, 104 S.Ct. 2557, 2565, 81 L.Ed.2d 457 (quoting *Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964)).

*Id.* at 389-90.  The "statutory rights contained within Title I and Title IV can sometimes seem to overlap, especially in cases like this one, where the alleged wrongful conduct implicates both the structure of union elections and the rights of individual union members to vote for the officers of intermediate bodies." *Conille v. Council 93 American Fed. Of State, Cty. and Municipal Employees*, 973 F.3d 1, 9 (1st Cir. 2020).

Mancilla and Kohnert-Yount may bring claims under Title I if the claims satisfy two criteria.  First, the claims must seek to remedy an "injury" that "falls within Title I's guarantees." *Id.*  Second, the claims "must seek 'appropriate' relief under [] Title [I]." *Id.*  As the Supreme Court has explained, "[w]hether a Title I suit

may properly be maintained by individual union members during the course of a union election depends upon the nature of the relief sought by the Title I claimants." *Local No. 82, Furniture & Piano Moving Drivers v. Crowley,* 467 U.S. 526, 543 (1984).  "[A]ppropriate relief under Title I may be awarded while a [union] election is being conducted" if the "allege[d] violations […] are easily remediable […] without substantially delaying or invaliding an ongoing election." *Id.* at 546.  In other words:

> If the remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV. For less intrusive remedies sought during an election, however, a district court retains authority to order appropriate relief under Title I.

*Id.* at 551.

## B

The Court will separately address whether Kohnert-Yount and Mancilla, respectively, have shown a likelihood of jurisdiction.

## 1

The Court begins with Kohnert-Yount and concludes that she has shown a likelihood that the Court has jurisdiction over her claims.  First, she has shown a likelihood that her alleged injuries fall within Title I's guarantees.  While the "line between a Title I and a Title IV violation is muddy," *Conille*, 973 F.3d at 9, "[t]he typical Title I claim involves an allegation of unequal treatment among union

members," *Molina v. Union De Trabajadores De Muelles Y Ramas Anexas, Local 1740*, 762 F.2d 166, 168 (1st Cir. 1985). Kohnert-Yount alleges that the UAW treated her unequally when it assigned her, as a member of Local 2320, to vote for the Regional Director who will represent the region in which she works while simultaneously assigning essentially all other UAW members to vote for the Regional Director who represents the region in which their local chapters are headquartered. Her allegation that she has been treated unequally in the election of Regional Directors likely falls within Title I.

Since Kohnert-Yount has shown a likelihood that her claimed injury falls within the rights protected by Title I, the Court must next consider whether she has shown a likelihood that the relief she seeks is appropriate under that Title. She has. She asks only that the Court require the UAW and Barofsky to send Local 2320 members ballots to vote in the Region 9A election for Regional Director. Granting that relief would neither delay nor invalidate the ongoing election. Simply put, the modest relief requested by Kohnert-Yount is likely available under Title I.

Defendants respond that ordering them to send ballots for the Region 9A election to all members of Local 2320, regardless of the member's geographic location, is not "appropriate relief" under Title I because it would fundamentally restructure the UAW's current election. The Court disagrees. To the extent any restructuring of the ongoing election took place, it was done by Defendants. As

explained above, when the current election process began – *i.e.*, during the nomination stage of the process – all members of Local 2320 were assigned to Region 9A. Between the end of the nomination process and the commencement of voting, the UAW (with Barofsky's later approval) restructured the election process by re-assigning members of Local 2320 from Region 9A to the regions in which they work. If the Court were to direct that all Local 2320 members should vote in Region 9A, the Court would merely be reinstating the structure originally adopted by the UAW and undoing the restructuring implemented mid-election by the UAW. The Court would not be restructuring the election in a manner that exceeds the scope of relief properly granted under Title I.

For all of these reasons, the Court concludes that Kohnert-Yount has shown a likelihood that the Court has jurisdiction over her claims.

**2**

The Court next turns to Plaintiff Mancilla and concludes that he has not shown a likelihood that the Court has jurisdiction over his claims. Unlike Kohnert-Yount, Mancilla does not allege that the manner in which the UAW assigned Local 2320 to vote had any direct impact on his right to vote or speak. Nor could he have done so. He is not a member of Local 2320. Thus, the allegedly-unfair voting assignments given to members of Local 2320 could not have diminished his personal right to cast an equal vote or to speak on equal terms with other union members. Instead of

pleading that the assignment of Local 2320 members violated his rights, Mancilla contends that the "UAW's actions harm[ed him by] removing from the list of [voters in Region 9A] those [members] who […] would likely have strongly supported him." (Compl. at ¶64, ECF No. 1, PageID.10.)  However, Mancilla has not cited any authority for the proposition that Title I protects him, as a candidate, from that alleged harm.[1]

For all of these reasons, the Court concludes that Mancilla has not shown a likelihood that the Court has jurisdiction over his claims.  He therefore is not entitled to injunctive relief.

## V

The Court now considers the injunction factors.  The Court concludes that Kohnert-Yount has failed to show that the balance of those factors weighs in favor of granting her requested injunctive relief.

## A

First, Kohnert-Yount has failed to show that she is likely to succeed on her claims.  Her primary claim is that the UAW "violated her equal right to vote under

---

[1] While the Court concludes that it lacks jurisdiction over Mancilla's claims, the result of the Court's ultimate ruling here – a denial of injunctive relief – would be the same even if the Court had ruled that it did have jurisdiction over Mancilla's claims under Title I.  That is because, as explained below (in the context of addressing Kohnert-Yount's claims), the applicable factors weigh against a grant of injunctive relief here.

federal law" when it denied her "the right to vote over the Regional Director who oversees her local union." (Compl. at ¶61, ECF No. 1, PageID.9.)  But she has not cited any case finding a violation of the equal right to vote under circumstances like those presented here.

Furthermore, she has not made a persuasive showing that she has been treated unequally.  Like all other UAW members, she has the right to cast one vote for a Regional Director.  She argues, however, that her vote is not equal to the vote of other members outside of Local 2320 because those members will be voting for a Regional Director who will be more accountable to them.  Her argument is as follows:

> Here, the right to vote on the Regional Director overseeing their local is being denied to Local 2320 members who work in units outside the Northeast in a disparate and discriminatory manner. The right of such members to vote for a different Regional Director does not cure the violation; that is not a right in any "meaningful manner" since such Regional Directors are not the ones with relevant power to affect those members' interests. Regional Directors "shall have direct supervision over all organizational activities within the region from which s/he is elected." UAW Constitution, Art. 13 Sec. 23. Regional Directors, as noted above, sign off on contracts, approve strikes, and assign and oversee international staff and use of international funds to locals, among many other responsibilities. For instance, the international staff representative assigned to Local 2320, who is the servicing representative for units across the country, including locations within Region 4 and the soon-to-be Region 6, is Hyacinth Blanchard, who is under the supervision of the Region 9A Director as the Region 9A Subregional

Director, and has been pulled to work on other Region 9A units and campaigns. If a member of Local 600 is concerned about the level of support from the international union, or is angry that a strike she voted to authorize was not allowed to occur or that a contract she supported was vetoed, she now has the right to vote out her Regional Director. By contrast, if a Local 2320 member who lives and works for a legal services provider in Texas is frustrated that the Local does not get the support from the international union to have more than two staffers covering the entire Southwest and Southeast, or is mad that their unit's decision to strike was vetoed by the Regional Director overseeing their Local, they do not have this recourse, as the Region 8 Regional Director is not the IEB member responsible for assigning staff to Local 2320. Certainly, the Region 8 Director would have no reason to even care about Local 2320, with the Local being the responsibility of another Regional Director and its voters in Region 8, having been diluted among the regions through this decision, being so few in number. It is unclear what, if any, authority the Region 8 Regional Director does have over the Texas-based 2320 member, such that she should have a vote over who occupies that office. But certainly, denying a Texas-based 2320 member a vote over the Regional Director who oversees their Local constitutes discriminatory treatment that violates Section 101(a) of the LMRDA.

(Mot., ECF No. 4, PageID.26-27.)

While that argument makes sense, the UAW has presented evidence that voting for a Regional Director who is located outside of Region 9A may actually benefit Kohnert-Yount and other members of Local 2320.  For example, the UAW has submitted a Declaration from Local 2320's President Pamela Smith in which Smith explains that Local 2320 "need[s] to have a political voice in the regions

23

beyond [Region] 9A because of the critical impact that decisions made in those regions can have on our membership." (Smith Decl. at ¶10, ECF No. 19-3, PageID.497.)  She then provided specific examples of how that was advantageous in practice: "[I]n 2014, Maryland defunded approximately 30 legal aid positions. The leadership of Local 2320, in turn, reached out to the then-Region 8 Director to obtain his assistance in fighting to have that funding restored. Similarly, in the early 2000s, Region 8 helped Maryland Legal Aid fight for and win a filing fee bill in the Maryland legislature that helped secure significant raises for our members." (*Id.*) Kimberly Navarette, a Local 2320 member who lives in Ohio, recounted a similar example of the value of voting for a Regional Director that lives in her region:

> 3.     In the upcoming election for UAW Executive Board, I want to vote in the Region 2-B election. It is important for me to be able to vote in the Director's election whose jurisdiction includes my worksite because the political and community connections in Ohio are critically influential to our bargaining relationship with our employer. This election for Region 2-B Director is a contested election.

> 4.     As a public employee who works for Lucas County Ohio, the Region 2-B Director position is politically connected to the county government that is my employer. For example, during contract bargaining in 2012, I recall we had particularly contentious contract negotiations and were on the verge of a strike. Our bargaining committee reached out to the Region 2-B Director at that time (Lloyd Mahaffey) and he in turn assisted us by exerting political pressure on the Lucas County Commissioners. The UAW Region 2-B Director's intervention was instrumental in assisting us avoid a strike and reach an agreement.

> 5.     Similarly, during the LAWS unit's 2016 contract negotiations, myself along with the others on the bargaining committee again reached out to the Region 2-B Director at that time (Ken Lortz) to assist in our negotiations with the Lucas County Commissioners. The Director assisted us in preventing concessions to our leave and flex time.

(Navarette Decl. at ¶¶ 3-5, ECF No. 19-5, PageID.509-510.)

Moreover, Smith explained that it is advantageous for Local 2320 members to vote for many different Regional Directors because that gives the Local potentially broader influence on the IEB as a whole. As Smith explained in her declaration, "as history shows, the [IEB] votes on items of critical importance to Local 2320 such as the subsidy we receive in recognition of our semi-autonomous and unique structure. By virtue of their office, UAW Regional Directors are members of the IEB, and being able to cast votes for nine (9) regional directors – because Local 2320 has worksites spread across 9 different UAW regions – strengthens Local 2320's voice on the IEB." (Smith Decl. at ¶10, ECF No. 19-3, PageID.497.)

For all of these reasons, the Court concludes that Kohnert-Yount has not shown a likelihood of success on her claim that the UAW denied her an equal right to vote when it assigned her to vote in a region other than Region 9A (*i.e.*, the region in which Local 2320 is headquartered).  Simply put, the record shows that there are potential advantages and disadvantages to that assignment, and the Court cannot find

that the disadvantages so outweigh the advantages as to make Kohnert-Yount's vote less equal than that of other UAW members.

Kohnert-Yount has also not shown a substantial likelihood that she will succeed on her second claim: that "by denying a majority of Local 2320's membership the right to vote over the Regional Director who oversees their local union, Defendant UAW has diminished the collective voting power" of Local 2320's membership. (Compl. at ¶62, ECF No. 1, PageID.10.)  Kohnert-Yount has not cited any case that holds that Title I guarantees to union members the right to collective voting power.  She relies on *Bunz v. Moving Picture Machine Operators' Protective Union Local 224*, 567 F.2d 1117 (D.C. Cir. 1977), but the court in that case did not recognize the broad theory of collective voting rights that Kohnert-Yount advances here.

In *Bunz*, "the question presented [… was] whether the federal courts ha[d] jurisdiction of a union member's claim that he was denied the 'equal right to vote' […] when his union conducted a referendum in plain disregard of its bylaws." *Id.* at 1118-19.  The union's bylaws "required that assessments be approved by two-thirds of members present." *Id.* at 1119.  The union held a vote on a particular assessment, and only fifty-nine percent of the members present voted for the assessment. *See id.* "[T]he local's attorney nevertheless ruled that the assessment had passed." *Id.*  The

court held that that ruling by the attorney violated the plaintiff's "equal right to cast a meaningful vote":

> [I]t seems clear that Local 224 discriminated against Bunz by depriving him of his equal right to cast a meaningful vote. Like other members who opposed the assessment, Bunz was allowed to cast a ballot; yet the minority's ballots were deprived of their effectiveness when the union, by issuing a patently frivolous interpretation of its constitution, raised the percentage of votes required to defeat the assessment from 34% To 51%. In so doing, the officers plainly discriminated against the minority, who opposed the assessment, and aligned themselves with the majority, for the obvious reason that the majority backed the officers' policy. Because the union thus deprived Bunz of his "equal right to vote" secured by [§] 101(a)(1), the court below had jurisdiction under [§] 102.

*Id.* at 1122.  As this passage makes clear, the court in *Bunz* did not recognize the broad right to collective voting strength that Kohnert-Yount presses here.  Since Kohnert-Yount's collective voting rights claim rests primarily on the inapposite decision in *Bunz*, she has not shown a likelihood that she will prevail on that claim.

Finally, Kohnert-Yount has not shown a likelihood of success on her right-to-speak claim.  That claim largely mirrors Kohnert-Yount's right-to-vote claim, and Kohnert-Yount has failed to show a likelihood of success on that claim for all of the reasons explained above.

### B

Kohnert-Yount has also failed to show that the three remaining injunction factors weigh in favor of granting her requested injunctive relief. The substantial

27

harm to others factor is at best in equipoise.  As described in detail above, Kohnert-Yount has presented some reasonable arguments as to how the members of Local 2320 may be harmed by being assigned to vote for Regional Directors who do not oversee Local 2320 (*i.e.*, who are not located in the region where Local 2320 is headquartered), but the UAW has countered with substantial evidence that those members (and the Local as a whole) may benefit in important ways from voting for Regional Directors in the regions in which they work.  Thus, the Court cannot conclude that granting the relief requested by Kohnert-Yount is necessary to prevent harm to third parties (*i.e.*, to members of Local 2320 who are not parties to this action).  For the same reason, the public interest factor does not weigh in favor of granting injunctive relief.  While the public may have a general interest in the fair and democratic operation of the UAW, for all of the reasons explained above, it is not clear that that interest is impaired by having Local 2320 members vote for Regional Directors in the regions in which they work.  Finally, it is not clear that Kohnert-Yount would suffer irreparable harm without an injunction.  Indeed, for all of the reasons explained above, it is not clear that she would suffer any meaningful harm absent an injunction.  And, in any event, it would seem that Kohnert-Yount (along with Mancilla) may be able to seek relief from the Secretary of Labor via a Title IV claim if the Court does not grant relief here.

For all of these reasons, the Court concludes that Kohnert-Yount is not entitled to injunctive relief.

## VI

Finally, the Court turns to a question that the Court asked the parties repeatedly during on-the-record conferences and at the hearing on the pending motion: Did the UAW violate Kohnert-Yount's right to an equal vote under Title I when it (1) assigned her to attend the nominating convention for Region 9A and then (2) after the convention, assigned her to vote for Regional Director in a different region? That potential inequality would arise from the fact that members of other local chapters would have the opportunity to vote for a Regional Director in a region in which they had the opportunity to nominate a candidate for that office, but Kohnert-Yount would be forced to vote in a region in which she lacked that opportunity.

This is an interesting and difficult question, but after carefully studying the Complaint in this case, the Court concludes that Kohnert-Yount has not pleaded a claim that raises this question. The gravamen of Kohnert-Yount's claims is spelled out in the Introduction to her Complaint. That section says nothing about the fact that Kohnert-Yount was assigned to vote in a region in which she was not permitted to nominate a candidate for Regional Director. Instead, in that section, Kohnert-Yount complains that the voting assignments of Local 2320 members (1) "weaken[s]

the influence of Local 2320" as a whole and (2) deprives Local 2320 of a Regional

Director who will be "fully accountable to [its] membership[]." (Compl., ECF No.

1, PageID.1.)

These contentions from the Introduction carry through to Kohnert-Yount's

pleading of her two claims.  Those claims (as quoted above in Section II) rest upon

Kohnert-Yount's contentions that the voting assignments of Local 2320 members

(1) deny the Local's members "the right to vote over the Regional Director who

oversees [their] local union" and (2) "diminish[] the collective voting power" of

Local 2320's members. (*Id.* at ¶¶ 61-62, PageID.10.)   The claims do not assert that

the UAW violated Kohnert-Yount's rights under Title I by assigning her to vote in

a region in which she did not have an opportunity to nominate a candidate for

regional director.[2]   Under these circumstances, the UAW reasonably interpreted

Kohnert-Yount's Complaint as "not assert[ing] any nominations issue." (UAW Opp.

Br. at n.9, ECF No. 19, PageID.169.)[3]   Because Kohnert-Yount has not asserted a

---

[2] The Complaint does allege in one paragraph that members of Local 2320 did not
have an opportunity to nominate candidates for Regional Director in the regions in
which they would be voting. (*See* Compl. at ¶40, ECF No. 1, PageID.6.)  But the
Complaint does not fairly indicate that Kohnert-Yount's claims rest upon that
allegation.

[3] Kohnert-Yount's Motion for Preliminary Injunction does briefly discuss the fact
that she has been assigned to vote in a region in which she did not have the
opportunity to make a nomination (*see* Mot., ECF No. 4, PageID.30), but that short
discussion is no substitute for asserting a claim based upon that circumstance.
Moreover, the short discussion does not make clear that Kohnert-Yount is pressing

claim based upon her assignment to vote in a region in which she was not permitted to nominate a candidate for Regional Director, the Court will not rule on whether that voting assignment deprived her of an equal right to vote.

During the hearing before the Court, Plaintiffs' counsel said that he could file an Amended Complaint that asserted a claim based upon Kohnert-Yount's assignment to vote in a region in which she was not permitted to nominate a candidate for Regional Director. But such an amendment, even if allowed, would come too late to be considered in these expedited injunction proceedings. The UAW and/or the Monitor explained that a decision on which region Local 2320 will vote in for Regional Director must be made by November 1, 2022, in order to avoid delaying the election. There is not enough time remaining to allow Kohnert-Yount to amend, to allow for additional briefing and argument on this new claim, and to issue a ruling before November 1.

---

an independent claim based upon the fact that she has been assigned to vote in a region in which she did not have an opportunity to nominate. For instance, the topic sentence of the paragraph containing the discussion addresses "[t]he weakening of the collective vote of Local 2320 members," and the paragraph elsewhere focuses on Kohnert-Yount's contention that the UAW has "alter[ed] the voter base mid-election." (*Id*., PageID.29.) Finally, in Kohnert-Yount's reply brief, she did more directly suggest that the UAW violated her right to an equal vote when it assigned her to vote in a region in which she was not permitted to nominate a candidate for Regional Director (*see* Reply, ECF No. 25, PageID.710), but that reference came too late to transform the issue into a properly-presented claim.

## VII

For all of the reasons explained above, Plaintiffs' motion for a preliminary injunction (ECF No. 4) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 28, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 28, 2022, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126